IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH C. CANOUSE, an individual<br><br>        Plaintiff,<br><br>v.<br><br>PROTEXT MOBILITY, INC.<br><br>        Defendant. | Case No. _____<br><br>**COMPLAINT**<br><br>**\*JURY TRIAL DEMANDED\*** |

COMES NOW Plaintiff Joseph C. Canouse ("Canouse"), by and through his undersigned attorney, and here files his Complaint, alleging as follows:

## I. PARTIES

1. Plaintiff is an individual residing in the State of Georgia, and consents to the jurisdiction of this Court.

2. Plaintiff is the sole shareholder and director of J.P. Carey, Inc.

3. In his capacity as sole shareholder and director of J.P. Carey, Inc., which itself was the holder of the debts and obligations further described herein, assigned all rights, privileges, and debts from J.P. Carey, Inc. to Joseph C. Canouse.

4. Defendant Protext Mobility, Inc. ("PMI") is a corporation duly organized under the laws of Delaware with its principal place of business located at 2255 Glades Road, Suite 324A, Boca Raton, Florida 33431. Defendant PMI may be served with process through its registered agent David Lewis at 2255 Glades Road, Suite 324A, Boca Raton, Florida 33431.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Plaintiff originally filed this lawsuit in Fulton County, Georgia. In response, Defendant challenged jurisdiction and submitted an affidavit of its Executive Director stating that "[t]he contracts that are at issue in this litigation were entered into in the State of New York with individuals believed to be New York residents at the time they were entered into."

7. Venue and personal jurisdiction in this District are therefore proper.

## III. NATURE OF ACTION

8. This Complaint is brought to recover principal plus interest, owed to Plaintiff by virtue of the valid and enforceable assignment of certain notes and obligations incurred by Defendant to Plaintiff.

## IV. FACTUAL ALLEGATIONS

A. **PMI's Various Obligations to Steven Berman.**

### The Employment Agreement

9. On or around May 1, 2013, Steven Berman entered into a binding and enforceable contract with PMI (the "Employment Agreement"), whereby he would serve as the CEO of PMI. A true and correct copy of the Employment Agreement is attached hereto as Exhibit "1."

10. Under the express terms of the Employment Agreement, PMI was to compensate Berman at a rate of $50,000.00 per quarter.

11. Steve Berman served as the CEO for PMI from May 1, 2013 through his resignation in September 2015. Thus, Mr. Berman served as the CEO for PMI for 28 months, or 9 and 1/3 quarters.

12. Mr. Berman's right of compensation under the Employment Agreement was therefore $466,666.67.

13. PMI never paid Berman his salary owed under the Employment Agreement.

### The BJA Agreement

14. On or about May 1, 2009, SearchHelp, Inc. ("SearchHelp") entered into a consulting agreement with BJA Media, LLC (the "BJA Agreement"). A true and correct copy of the BJA Agreement is attached hereto as Exhibit "2."

15. SearchHelp was PMI's predecessor and BJA Media, LLC was Berman's company.

16. The BJA Agreement contemplated certain bonus payments up to $500,000.00.

17. Berman introduced SearchHelp to an investor who ultimately invested $5,000,000.00 in SearchHelp. In return, SearchHelp gave Berman a $500,000.00 bonus pursuant to the BJA Agreement.

18. SearchHelp paid Berman $170,000.00 under the agreement, but refused to pay the remaining $330,000.00.

### The Shanker Note

19. On or around September 21, 2013, PMI executed a convertible promissory note ("Shanker Note") under which PMI acknowledged its indebtedness to John Shanker in the principal amount of $10,000.00 or an amount following the conversion or conversions of the Shanker Note in accordance with the terms of the Shanker Note, and agreed to repay Plaintiff in

90 days of execution of the Shanker Note with interest at the rate of 12% per annum. A true and correct copy of the Shanker Note is attached hereto as Exhibit "3."

20. The Shanker Note defined the holder's right of conversion as follows: "The Buyer shall have the right to convert the Note(s) represented in this transaction into Shares of Common Stock at any time after the maturity and or the effective date of a registration, whichever is sooner. Upon written notice of such conversion, the conversion price shall be equal to 50% percent [sic] of the ten (10) day VWAP prior to the date of conversion . . . ."

21. On or around January 20, 2017, John Shanker assigned the Shanker Note to Steven Berman. A true and correct copy of the Allonge is attached hereto as Exhibit "4."

22. Under the express terms of the Shanker Note, the note was transferable and/or assignable to "affiliates of the Holder." (Exhibit 3, p. 2.) Steven Berman was an affiliate of John Shanker.

## The Levine Note

23. On or around December 11, 2013, PMI executed a Convertible Note ("Levine Note") under which PMI acknowledged its indebtedness to Joel Levine in the principal amount of $7,000.000 or an amount following the conversion or conversions of the Levine Note in accordance with the terms of the Levine Note, and agreed to repay Plaintiff in 45 days of execution of the Levine Note with an interest rate of 12% per annum. A true and correct copy of the Levine Note is attached hereto as Exhibit "5."

24. The Levine Note defined the holder's right of conversion as follows: "The Buyer shall have the right to convert the Note(s) represented in this transaction into Shares of Common Stock at any time after the maturity and or the effective date of a registration, whichever is

sooner. Upon written notice of such conversion, the conversion price shall be equal to Sixty Five (65%) percent of the ten (10) day VWAP prior to the date of conversion (35% discount)."

25. On or around December 8, 2016, Joel Levine sold, assigned, transferred, and conveyed unto Steven Berman his rights and interests in all accrued debt under the Levine Note and Employment Agreement between Levine and PMI. A true and correct copy of the Notice of Sale and Assignment of a Promissory Note and Outstanding Obligations is attached hereto as Exhibit "6."

26. Under the express terms of the Levine Note, the note was transferable and/or assignable to "affiliates of the Holder." (Exhibit 5, p. 2.) Steven Berman was an affiliate of Joel Levine.

### The J. Berman Note

27. On or around October 9, 2013, PMI executed a Convertible Note ("J. Berman Note") under which PMI acknowledged its indebtedness to Jonathan Berman in the principal amount of $5,000.00 or an amount following the conversion or conversions of the J. Berman Note in accordance with the terms of the J. Berman Note, and agreed to repay Plaintiff 90 days after the execution of the J. Berman Note with an interest rate of 12% per annum. A true and correct copy of the J. Berman Note is attached hereto as Exhibit "7."

28. The J. Berman Note defined the holder's right of conversion as follows: "The Buyer shall have the right to convert the Note(s) represented in this transaction into Shares of Common Stock at any time after the maturity and or the effective date of a registration, whichever is sooner. Upon written notice of such conversion, the conversion price shall be equal to 50% percent [sic] of the ten (10) day VWAP prior to the date of conversion (50% discount)."

29. On or around December 27, 2016, Jonathan Berman sold, assigned, transferred, and conveyed unto Steven Berman his rights and interests in all accrued debt under the J. Berman

Note and Employment Agreement between Jonathan Berman and PMI. A true and correct copy of the Notice of Sale and Assignment of a Promissory Note and Outstanding Obligations is attached hereto as Exhibit "8."

30. Under the express terms of the J. Berman Note, the note was transferable and/or assignable to "affiliates of the Holder." (Exhibit 7, p. 2.) Steven Berman was an affiliate of Jonathan Berman.

**B.    Steven Berman Assigns his Rights and Interests to J.P. Carey Enterprises.**

31. On or around April 19, 2017, Steve Berman sold, assigned, transferred, and conveyed unto J.P. Carey Enterprises, Inc. his rights and interests in all accrued debt under the Shanker Note, the Levine Note, and the J. Berman Note (collectively the "Convertible Notes"), the Employment Agreement, and the BJA Agreement. A true and correct copy of the Notice of Sale and Assignment of a Promissory Note and Outstanding Obligations is attached hereto as Exhibit "9."

**C.    Plaintiff's Damages**

<u>**Damages under the Shanker Note**</u>

32. On or around May 31, 2017, Plaintiff elected to convert $14,819.59 in principal and accrued interest of the Shanker Note into 29,639,189 shares of Common Stock pursuant to the conversion price. A true and correct copy of the Notice of Conversion is attached hereto as Exhibit "10."

33. Plaintiff was therefore entitled to purchase $14,819.59 worth of shares at a fifty percent of the ten day VWAP prior to the date of conversion.

34. As shown by the conversion notice, the 10 day VWAP was $0.0010.

35. Plaintiff was therefore entitled to purchase $14,819.59 worth of shares at $0.00050 per share, or 29,639,189 shares.

36. The May 31, 2017, notice of conversion was ignored by PMI.

37. Had PMI honored its obligated and converted the note, the shares would have born a restrictive legend preventing trading.

38. Once in possession of the shares with the restrictive legend, Plaintiff would have to have hired counsel to issue a legal opinion concerning removal of the legend. Once the legal opinion was issued, Plaintiff would then send the legal opinion and common shares to PMI's transfer agent for removal of the legend.

39. Upon removal of the restrictive legend, Plaintiff would have been free to sell his shares. At all times relevant hereto the trading volume was sufficient to support Plaintiff's sale of the shares at issue.

40. The process from notice of conversion through and including removal of the restrictive legend typically take fifteen (15) business days.

41. On June 15, 2017, 15 business days after Plaintiff gave notice of conversion, PMI shares traded at a daily average of $0.0010.

42. PMI's failure to honor Plaintiff's conversion notice issued on May 31, 2017 damaged Plaintiff in an amount to be proven at trial, but not less than $29,659.19.

**Damages under the Levine Note**

43. Plaintiff provided written notice of conversion when he filed his original complaint in the State Court of Fulton County, Georgia on July 27, 2017.

44. Thus, pursuant to the agreement, Plaintiff was entitled to purchase $10,066.00 worth of shares at a thirty-five percent of the ten day VWAP prior to the date of conversion.

45. The 10 day VWAP was $0.0010.

46. Plaintiff was therefore entitled to purchase $10,066.00 worth of shares at $0.00065 per share, or 15,486,153 shares.

47. Had PMI honored its obligations and converted the Note, the shares, as a matter of common practice, would have born a restrictive legend preventing trading.

48. Once in possession of the shares with the restrictive legend, Plaintiff would have had to hire counsel to issue a legal opinion concerning removal of the legend. Once the legal opinion was issued, Plaintiff would then send the legal opinion and common shares to PHS's transfer agent for removal of the legend.

49. Upon removal of the restrictive legend, Plaintiff would then be free to sell his shares. At all times relevant hereto the trading volume was sufficient to support Plaintiff's sale of the shares at issue.

50. The process from notice of conversion through and including removal of the restrictive legend typically take fifteen (15) business days.

51. On August 11, 2017, 15 business days after Plaintiff gave notice of conversion, PMI shares traded at a daily average of $0.0009 per share.

52. PMI's failure to honor Plaintiff's conversion notice therefore damaged Plaintiff in the amount of $13,937.40 under the Levine Note.

**Damages under the J. Berman Note**

53. Plaintiff provided written notice of conversion when he filed his original complaint in the State Court of Fulton County, Georgia on July 27, 2017.

54. Thus, pursuant to the Note, Plaintiff was entitled to purchase $7,148.00 worth of shares at a fifty percent of the ten day VWAP prior to the date of conversion.

55. The 10 day VWAP was $0.0010.

56. Plaintiff was therefore entitled to purchase $7,148.00 worth of shares at $0.0005 per share, or 14,296,000 shares.

57. Had PHS honored its obligations and converted the Note, the shares, as a matter of common practice, would have born a restrictive legend preventing trading.

58. Once in possession of the shares with the restrictive legend, Plaintiff would have had to hire counsel to issue a legal opinion concerning removal of the legend. Once the legal opinion was issued, Plaintiff would then send the legal opinion and common shares to PHS's transfer agent for removal of the legend.

59. Upon removal of the restrictive legend, Plaintiff would then be free to sell his shares. At all times relevant hereto the trading volume was sufficient to support Plaintiff's sale of the shares at issue.

60. The process from notice of conversion through and including removal of the restrictive legend typically take fifteen (15) business days.

61. On August 11, 2017, 15 business days after Plaintiff gave notice of conversion, PMI shares traded at a daily average of $0.0009 per share.

62. PMI's failure to honor Plaintiff's conversion notice therefore damaged Plaintiff in the amount of $12,866.40 under the J. Berman Note.

63. PMI's breach on the Convertible Notes damaged Plaintiff in the amount of $56,462.99, plus interest.

64. PMI is, therefore, liable to Plaintiff under the Convertible Notes for $56,462.99, plus interest.

**Damages under the Agreements**

65. By virtue of the assignment of Notes and other obligations by Steve Berman to Plaintiff, Defendant is also liable for the following:

   a. $466,666.67 owed under the Employment Agreement;

   b. $330,000.00 owed under the BJA Agreement;

**COUNT I**
**BREACH OF CONTRACT**

66. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

67. PMI entered into valid and binding contracts (the Employment Agreement, the BJA Agreement, the Shanker Note, the Levine Note, and the J. Berman Note), which were validly assigned to Plaintiff.

68. PMI breached those contracts by failing to honor its obligations as set forth in the Convertible Notes and Agreements.

69. PMI's failure and refusal to perform the obligations set forth in the Convertible Notes and Agreements are breaches of contract entitling Plaintiff to recover damages.

70. Plaintiff's damages arising from and proximately caused by PMI's wrongful conduct is $853,129.66.

71. Plaintiff is entitled to a judgment against PMI for $853,129.66, plus interest and attorney's fees.

**COUNT II**
**CONVERSION**

72. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

73. PMI had, at all times relevant, possession, custody, and control of Common Stock belonging to Plaintiff.

74. PMI was required to issue a certificate to Plaintiff for the Common Stock.

75. PMI failed and refused to issue the certificate to Plaintiff.

76. Instead, PMI used shares that should have been issued to Plaintiff for other purposes, thereby converting Plaintiff's shares to its own use.

77. Plaintiff demanded the issuance of his shares such that they would be in his control and no longer under the illegal dominion and control of PMI.

78. PMI, despite demand and lacking lawful reason, exercised dominion and control over shares belonging to Plaintiff.

79. As a direct and proximate result of PMI's wrongful conversion of common stock, Plaintiff has been damaged in an amount to be proven at trial, but believed to be valued at no less than $56,462.99.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this matter be set for jury trial, and that upon the trial thereof, that he be granted a judgment in his favor, awarding him:

(1) damages for all amounts sought above;

(2) pre- and post-judgment interest as allowed by law;

(3) reasonable attorney's fees and expenses;

(4) court costs; and

(5) all such other relief, at law and in equity, to which he may be justly entitled.

Respectfully submitted this 23rd day of April, 2018.

**THE PLAINTIFF**
By his attorneys

**FLEISCHER LAW, LLC**

By:   /s/ Robert M. Fleischer
   Robert M. Fleischer
   12 Centennial Drive
   Milford, CT 06461
   Tel: (203) 283-3369
   Email: robf@ctnylaw.com

- and-

**FRIED & BONDER, LLC**

By: s/ Scott L. Bonder
   Scott L. Bonder (***Pro Hac Vice to be filed***)
   Georgia Bar No. 066815
   Matthew R. Kahn (***Pro Hac Vice to be filed***)
   Georgia Bar No. 833443
   White Provision, Suite 305
   1170 Howell Mill Road, N.W.
   Atlanta, Georgia 30318
   Telephone: (404) 995-8808
   Facsimile: (404) 995-8899